UNITED STATES v. 257.654 ACRES OF LAND AT MOANALUA AND HALAWA, OAHU, TERRITORY OF HAWAII et al., and twelve other cases.

Civ. Nos. 514, 521, 525, 527, 529, 532, 533, 535, 536, 540, 544, 548, 684.

District Court, Hawaii.

Aug. 22, 1947.

McLAUGHLIN, Judge.

Prior to the institution by the United States, in exercise of its eminent domain powers, of these consolidated thirteen condemnation cases, the Honolulu Plantation Company operated adjacent to Pearl Harbor, upon the Island of Oahu, an irrigated 4,397.34-acre sugar plantation and also a refinery. Since its inception in 1899 this California corporation has conducted its business upon leased land, except for scattered parcels which by good fortune from time to time it has been able to buy in fee. Leasehold plantations, incidentally, are the rule rather than the exception in Hawaii, for usable land in Hawaii is scarce and tightly held by a comparatively few large corporation, trust, and estate owners who buy but rarely sell. As illustrative, in 1945 of the 386,560 acres comprising the Island of Oahu 61.04% of all the land was owned by twenty-eight owners, of whom but one was an individual. Governmental agencies owned 26.63% of the land, leaving but 12.33% as owned by all others—the bulk of Oahu's population of 348,045 (July 1, 1945). See Exhibit No. 14.

As a result of these thirteen takings in connection with the expansion of the naval base known as Pearl Harbor—all of which takings under the stipulation of consolidation were agreed to be as of June 21, 1944 —the Honolulu Plantation Company was reduced in size from a 4,397.34-acre enterprise to a 3,309.75-acre plantation, or put in terms of tons of raw sugar, from a 21,-000-ton plantation to a 15,000-ton plantation.

Arising out of the 1,364.35-acre takings by the Government in these cases, of which 1,087.59 acres were cane land, crop damage having been settled, the Honolulu Plantation Company claims here just compensation for:

Charles F. Rathbun and Wilmer H. Driver, Sp. Assts. to Atty. Gen., for petitioner.

Stanley, Vitousek, Pratt & Winn, of Honolulu, T. H., for defendant Honolulu Plantation Co.

(1) The taking of certain fee simple land and the improvements thereon owned by it;

(2) The taking of certain improvements upon land which it held under lease;

(3) Rent prepaid under a lease; and

(4) Severance damage.

The jury-waived trial of these issues was of considerable length (December 2, 1946, to January 15, 1947, inclusive of recesses for holidays and the illness of defendant's chief attorney, of which after the trial he suddenly died), and the final brief was filed herein June 5, 1947.

The questions will be resolved in the order above stated, a sequence which reserves to the last the principal issue between the parties, which happens also to have been an issue considered by the Committee on Claims of the House of Representatives, 79th Congress, 1st Session, Report No. 1313 dated November 28, 1945. H. R. 2688 passed the House, but not the Senate.

I. *What was the fair market value on June 21, 1944, of lands and improvements owned in fee by the Honolulu Plantation Company?*

The evidence given by the witnesses may be summarized as follows:

| Civil No. | Parcel No. | Government | Defendant |
|---|---|---|---|
| 521 | 24 | $100 | $470 |
| | A long narrow parcel 35 feet wide and 600 feet long, .47 acre, of which .107 acre is dry, .273 acre swampy, and .18 acre wet but suitable for certain agriculture. A Hawaiian kuleana, that is, a small homestead area owned in fee inside the boundaries of land owned by another and possessing a limited easement of access, not merchantable as lots served by roads. | (Child: Based upon $700 an acre for dry land; $400 an acre for wet land; $50 an acre for swamp land.) | (Ewart: Based upon $1000 an acre.)<br><br>$500<br>(Moses: Based upon estimate of worth to surrounding owner.) |
| | 2B. | $75 | $535 (Ewart) |
| | A small kuleana. .107 acre. Square shape. | (Child) | $500 (Moses) |
| 529 | F-1 | $3,500 | $462 |
| | A kuleana. .77 acre. Site of Honolulu Plantation abandoned Pumping Station, improved by a pump house, a small dwelling, miscellaneous storage sheds, and four artesian wells: (1) 175 feet deep; (2) 180 feet deep; (3) 176 feet deep; (4) 176 feet deep, connected to pump station, pump removed. | (Child: Land, plus all improvements, best use as homesites. Wells, overimprovement, valued at $10; pump house 58% good at $2,500; dwelling 32% good at $768; sheds at $100.) | (Ewart: Land only at $600 per acre.)<br><br>$500<br>(Moses: Land only)<br><br>$24,500<br>(Austin: Value of wells and pump station 80% good, replacement cost less depreciation $23,000 plus $1,500 for dwelling, sheds, etc.) |
| | F-2 | $400 | $514 |
| | .787 acre. Also a kuleana, by stream, no improvements. | (Child: At $1000 an acre and at $250 an acre along stream.) | (Ewart: At $600 an acre.)<br>$500 (Moses) |

| 535 | 2.732 acres | $14,100 | $17,850 |
|---|---|---|---|
| | In Plantation village of **Aiea**, 238-foot frontage on main highway; also road along one side; near school, church, and shops. Highest and best use agreed to be for residence purposes; 7 miles from Honolulu; 700 feet to Aiea center. | (Child: Based on comparable sales. Gave 25 cents a square foot on main highway; 20 cents a square foot along road; 15 cents a square foot inside lots; over-all 16.9 cents a square foot, minus subdivision costs of 5% and profit 25%.) | (Moses: Based upon comparable sales, applied in general.) |

In Civil No. 521 I find the fair market value of parcel 2A to be $100 and of parcel 2B to be $75.

From these two findings it is obvious that as to their market value I have adopted the opinion of John Francis Child, Jr., local appraiser. I have done so because I have been impressed with his careful analysis of the factors involved and the reasons given by him for his opinion. On the contrary, George Robert Ewart, III, manager of the land department of the Company's agent, C. Brewer & Company, Ltd., based his judgment upon a base of $1,000 an acre, and A. L. Moses, local appraiser, upon his opinion of the two kuleanas' worth to surrounding owners. It seems to me that Mr. Ewart, a plantation man so to speak, was thinking in terms of the commonly referred to $1,000-an-acre rule as to sugar-cane lands. In any event, due to the size, shape, and condition of these kuleanas even Mr. Ewart would, I am sure, concede that the land is not all usable farm land. Mr. Moses, experienced as he is, seemed to place his weight upon the nuisance value which a kuleana might have to the one who owns the land surrounding it. Such does not reflect market value.

In Civil No. 529 as to both parcel F–1 and parcel F–2, I disregard Mr. Moses' opinion as being based upon the nuisance value to the owners whose land surrounds the two kuleanas.

And as to the land, here again Mr. Child's approach and reasoning is to my mind a better reflection of market value than Mr. Ewart's. Here, indeed, Mr. Child is higher than Mr. Ewart, for he used a $1,000-an-acre base adjusted for size, while Mr. Ewart used a base of $600 an acre. Both men agreed that these kuleanas would be best used, as was their original purpose, as homesites, and Mr. Child pointed out that due to size they would be uneconomic as farm sites and based his opinion upon a sale of a larger area across the stream from parcel F–2, an instance of 9.916 acres selling for $1,347 an acre.

So as to parcel F–2, I find the value to be $75.

The crucial point as to parcel F–1 relates to the four wells and pump house. Here the question is: Though the value of the improvements must be stated separately under the Hawaiian statute (Section 314, Revised Laws of Hawaii 1945), to what extent, if any, did the buildings and the wells enhance the value of the land?

On this point defendant produced H. A. R. Austin, a civil engineer, who testified that:

1. Though the defendant's books revealed a theoretical depreciation of 2%, or 68% good, the 4 sixteen-year-old encased artesian wells were actually 80% good, for all that was needed to operate them was pipe, fittings, and an adequate pump—if in 1944 such things could be purchased—and the pumping station could be put into operation in about two months, as against six months to dig and equip new wells. Re-

·equipped these wells would supply many millions of gallons of fresh water daily.

As before noted, the Honolulu Plantation Company had removed its pump for use elsewhere, as it obtained used water cheaper from the nearby Hawaiian Electric Company power station—water which the Electric Company had first used for cooling purposes.

Mr. Austin figured the replacement cost of the pumping station and wells to be $27,916.72, and that hence the current value of these things was $23,000 upon a basis of 80% good.

Mr. Austin said his figure represented the extent to which the pumping plant enhanced the land's value, and that he considered the demand for water by the City, the Navy, and others and general conditions at the time (June 1944). He agreed that very little of the water available would be needed in the .77 acre in parcel F–1, so he visualized use or sale of the water off the parcel.

2. As to his $23,000 figure, Mr. Austin added as a rough guess $1,500 for the house and sheds adjacent to the pump house—a frame, single-wall, two-story, plantation-type house with· a corrugated iron roof— and thus obtained his figure of $24,500.

3. He conceded that the land surrounding parcel F–1 was not owned by defendant and that a buyer would have to obtain easements for a pipeline to get water off parcel F–1 for use elsewhere or for sale.

4. Though he had not reflected upon it previously, the wells and pump house would have a salvage value of $1,000.

Contrasted with the civil engineer's approach is that of Mr. Child, who stated:

(a) The pump house, excluding a pump, had a replacement value of $4,320 and was .58% good, or had a value of about $2,500;

(b) The frame house (480 sq. ft.) had a ·replacement value of $2,400 and was 32% good in June·1944, or had a value of $768;

(c) To the sheds he gave a nominal value of $100; and

(d) To the four wells he gave a figure of $10, for he claimed them to be an overimprovement for the .77 acre which was best used as a homesite. Mr. Child noted, of course, the fact that as the land was surrounded by land of others, it would not be possible to take the water off parcel F–1 without easements, so he considered it only as an independent kuleana.

There is a degree of soundness to Mr. Child's position insofar as the kuleana itself is concerned, for indeed it could never use all of the water that could be developed thereon. And it is true also that the problem is not the special value which this lot with its water might have to the Honolulu Plantation Company, which, by the way, the evidence showed is now very little as the wells have been abandoned in favor of a cheaper source and hence are now but a potential standby source of water.

■ On the other hand, it is common knowledge that here in the middle of the Pacific not only is fresh water always relatively scarce, but particularly at the date of taking was it so. The Island's population had more than doubled due to the war, and the Navy needed more fresh water constantly for its ships. I am thus inclined to accept Mr. Ausin's statement that in view of the demand for water by the Board of Water Supply of the City and County of Honolulu, the nearby Pearl City water system (suburban), and the Navy and the condition of the times—war conditions,—a prospective buyer would consider as enhancing the value of the kuleana the fact that an abundant supply of fresh water could be developed upon the land from the existing wells by the installation of a few new pipes and a good pump. The Government stresses the lack of availability to civilians of such things as pipes and pumps in June 1944. But even if it is not required to assume a normal state of affairs in fixing market value, still it is reasonable to assume for such a vital commodity as fresh water for purposes of human consumption or agricultural use that at that time appropriate priorities to obtain the needed equipment could readily be obtained by a buyer.

And if in the McCandless case [McCandless v. United States], 1936, 298 U. S. 342, 56 S.Ct. 764, 80 L.Ed. 1205, it was error for this Court to refuse an offer to prove that

water could be developed elsewhere and transported miles over land owned by others to make the subject land sugar-cane land, here in the reverse it would seem also to be in order to assume that a buyer could at a reasonable cost obtain the necessary pipe-line easement to get the water off the land in order to use it elsewhere or sell it.

■ Thus I find the market value of parcel F–1 in Civil No. 529 to be $24,638, representing:

The land alone.....$ 770 (Child's basis of $1,000 an acre, .77 acre)

The degree to which the pump house and four wells enhanced its value..$23,000 (Austin)
The frame house... 768 (Child)
The sheds ........ 100 (Child)

$24,638

In Civil No. 535 Mr. Moses and Mr. Child agreed as to the description of the land and in general relied upon comparable data. But here again I accept Mr. Child's opinion, for it seems to me his concrete application of the comparable data to the subject property is more helpful and exact then Mr. Moses' general conclusion from like but unapplied data that he gave the parcel an over-all value of 15¢ a square foot.

■ Thus I find the market value of the 2.732 acres in Civil No. 535 to be $14,100.

II. *Is the Honolulu Plantation Company entitled to compensation for a concrete supply ditch constructed upon land leased by it from (1) the Bishop Estate and (2) the Oahu Railway and Land Company?*

The state of the evidence is as follows:

1. The ditch, though partly on the land of two fee owners, is a continuous one. It is a 2 by 1.8 foot concrete supply ditch, and has headwalls, culverts, and openings and where it passes under a road siphon boxes also made of concrete. From this ditch water brought to it by pumps is taken off as needed into irrigation ditches to water the sugar cane.

2. Two thousand five hundred sixty-five (2,565) feet of the ditch, built in 1937, are on land leased from the Bishop Estate.

3. One thousand nine forty-five (1,945) feet of it, built at the same time, are on land leased from the Oahu Railway and Land Company.

4. Neither it nor any of its parts are removable, except as useless concrete rubble.

5. Mr. Child considered it as a good immovable improvement of the fee but as having no value apart therefrom.

6. Mr. Austin, who designed and laid out the ditch, in reliance upon provisions in the two leases which will be mentioned, stated upon a replacement cost less depreciation the part of the ditch on Oahu Railway and Land Company land enhanced the fee by $7,725 and the part of the ditch on Bishop Estate land enhanced the fee by $11,750.

By assuming that each lease would run until its specified expiration date, he depreciated the value of the ditch to the end of the lease to determine the present value of the lessor's interest, which he deducted in each case from the above figure, and thus stated that $6,185 represented the value of the lessee's interest in the ditch on Oahu Railway and Land Company land upon the date of taking and $9,400 was the value of the lessee's interest in the part of the ditch on Bishop Estate land upon the date of taking.

The question is basically: Is the Honolulu Plantation Company entitled to these amounts or to nothing for the supply ditch?

The answer will depend upon the construction of the two leases.

The Oahu Railway and Land Company lease to the Honolulu Plantation Company (Exhibit 9–I) provides that upon the expiration of the lease "or sooner determination" all improvements shall become the lessor's property. The Bishop Estate lease (Exhibit 9–G) similarly so provides.

But each lease also has an additional provision that in the event of condemnation the lessee's estate shall cease and determine and it shall not be entitled to any compen-

sation, except as to certain improvements. As to improvements made by the lessee after January 1, 1936, in the case of the Bishop Estate lease (December 2, 1943, amendment to the lease) or after the date of the execution of the Oahu Railway and Land Company lease (July 24, 1936, such compensation as shall be awarded for improvements built by the lessee after 1936 shall be divided "as their [lessor-lessee] interests shall appear, dependent upon the then unexpired term of the lease; * * *"

■ The Government contends that under these leases the Honolulu Plantation Company owns nothing for which it can be compensated because both leases state that at the end of the term "or sooner termination" all improvements shall become the property of the lessor. True, but the Government chooses to overlook the specific provisions controlling in the event of condemnation. It is my belief that here the specific governs the general provisions, and it is obvious that the general clause does not involve termination of the lease by condemnation. In any event the parties took this possibility out from under the general clause by specifically providing for such a contingency, and the specific controls. See Brooklyn Eastern Dist. Terminal v. City of New York, 2 Cir., 1944, 139 F.2d 1007, 152 A.L.R. 296, and Restatement, Contracts, Vol. I, paragraph 236.

■ In view of this holding, upon the basis of the evidence—indeed the only evidence on the point—and believing it proper for valuation purposes to assume that the leases would run their full terms, I find in Civil No. 529 the fair value of the Honolulu Plantation Company interest in this ditch on June 21, 1944, to be:

(1) $6,185 for the part on the Oahu Railway and Land Company land; and

(2) $9,400 for the part on the Bishop Estate land.

■ III. *In Civil No. 535, is the Honolulu Plantation Company entitled to $1,350 representing rent prepaid by it under its sublease obligation to Oahu Sugar Company covering the rent period January 11,* *1943, to September 21, 1944, and paid while the Navy was in possession under a right of entry from the Honolulu Plantation Company?*

When the question is stated all of the facts appearing in the record are known. Those are all of the facts, and while the Honolulu Plantation Company has paid the rent for a period during which it itself did not enjoy possession of the subleased property, upon just what basis it relies in claiming that in this proceeding the United States should pay that amount to it is not at all clear.

Apparently through its own fault in not protecting itself under these circumstances, the Honolulu Plantation Company was caught between the right of entry it gave the Navy and its obligation to pay rent nevertheless to Oahu Sugar Company, its sublessor. The fact that it is out of pocket to the extent of $1,350 does not in and of itself entitle it to relief, especially in a proceeding to establish the market value of an estate in land taken by eminent domain. And in this regard under I herein it has been awarded the value of its estate taken by the Government in Civil No. 535.

For lack of proof this claim to compensation is denied. It would appear that if a remedy at all exists it would lie against Oahu Sugar Company, but that, in turn, might depend upon facts not here revealed.

IV. *Is the Honolulu Plantation Company entitled to severance damage?*

Under the Company's leases, it is alleged that reserved to it is the right to claim severance damage, and as it has so claimed. this is *the* question in these consolidated cases.

An affirmative answer involves a possible award on this issue at the rate of $1,000 per acre for the 1,087.59 cane acres taken while under lease to the Company.

The Company's case is built squarely upon the Circuit Court's language in United States v. Baetjer, 1 Cir., 1944, 243 F.2d 391, certiorari denied, 1944, 323 U.S. 772, 65 S.Ct. 131, 89 L.Ed. 618. In that case the First Circuit Court reversed the lower court and remanded the case for

further proceedings, which are now reported in United States v. 7936.6 Acres of Land, etc., D.C. Puerto Rico, 1947, 69 F. Supp. 328.

This claim is smaller than the Company's Congressional Claim, for it related to 26 takings (prior ones plus the thirteen here), or 2,428.44 acres for which relief in the sum of $3,200,000 was asked. Before Congress the Company agreed with the Government that the loss for which it sought relief was a noncompensable capital loss. When the claim reached the Senate, attention was focused upon the part of the claim pending in this Court. With the Baetjer case in mind, the Senate took no action but intimated that the legal issue in these thirteen cases be first resolved.

It is upon the basis of the following that the claim in these cases is predicated:

1. The Honolulu Plantation Company had been developed to the point of being a 36,000-ton sugar (raw) plantation, had been generally successful, and had a good prospect as to the future.

2. Starting in 1939, the Government began taking defendant's property for military use in piecemeal fashion, so that by the date of the outbreak of World War II the takings had reduced the Honolulu Plantation Company to a 21,000-ton plantation, that is, to a point where it could just barely stay in business.

3. Due to military needs in World War II, the Government thereafter in these thirteen separate takings acquired 1,364.35 acres more of defendant's leased land, of which 1,087.59 acres were cane lands. In consequence the Company's cane acreage was reduced to 3,309.75 acres and the Company's agricultural enterprise to a 15,000-ton plantation.

4. There were no other cane lands available in fee or by lease.

5. As a result of these takings bringing this situation about, the land and the permanent improvements thereon remaining have depreciated in value solely due to the severance of the lands taken in these cases, which, with the lands remaining, the Honolulu Plantation Company had operated in a unit as a sugar plantation.

6. The damage caused by this severance is the difference between the value of the Honolulu Plantation Company before and after these thirteen takings. There being no market in 1944 for sugar plantations, the figures used are said to reflect fair value.

The Government stands upon the legal proposition that defendant's evidence describes a business loss and business losses are not compensable in condemnation proceedings. It thus offered no evidence. Indeed, there is no serious dispute upon the law between the parties. The Government concedes that in a proper case severance damage is recoverable. The dispute, therefore, is largely whether the defendant's evidence spells out a proper case of severance damage or an uncompensable business loss.

Summarized, this is the gist of the testimony of defendant's expert witnesses:

A. *George L. Schmutz,* an appraiser of renown and of wide and varied appraisal experience and author of several books on real estate appraising, such as "Condemnation Appraiser's Handbook" (1938) and "The Appraisal Process" (1941), gave it as his considered opinion that *before* these takings the fair value of all the Honolulu Plantation Company's physical properties, exclusive of movables and growing crops, was $4,200,000, and *after* the takings $3,113,000, or a loss of $1,000 per cane acre taken.

Mr. Schmutz's testimony disclosed that he literally considered everything without —in expert fashion—giving any one item any particular weight or dollar value. To mention some of his considerations, he said he took into general consideration:

1. That the Honolulu Plantation Company was an "integrated enterprise engaged in a perfected synchronization of an agricultural and an industrial productivity" by which he meant it grew sugar cane, processed it into raw sugar, and further refined it into white sugar;

2. The Company's dividend record;

3. That in 1940 the Company renewed or extended its major leases to 1965 and, in effect, became a new enterprise;

4. The additional capital of $1,325,000 invested since the leases were renewed;

5. The Company's book value;

6. Its earning record;

7. A $1,000-per-acre standard as representing widely held local opinion as to the per-acre value of sugar-cane land;

8. That the mill's capacity *before* the takings was 20,000 tons of raw sugar and *after* 15,000 tons;

9. That the takings affected the value of the mill by causing an overcapacity, which increased operating costs, resulting in not as fair a return upon the investment as was previously the case;

10. The fact that the lands were not replaceable; and

11. That raw sugar to refine was not purchasable in sufficient amount to utilize the mill's capacity.

And upon cross-examination Mr. Schmutz allowed that:

(a) He prepared the appraisal section of the Company's claim to Congress;

(b) He studied the Company's earning record as an indication of value;

(c) He studied the Company's dividend record to see if it was successful, and had it not so shown, his opinion would have been different;

(d) There was an error in his figures in the Congressional Claim (Exhibit O, Table I) due to inaccurate data supplied him, but said if the Company lost $334,265 in 1938 and $197,559 in 1939, he could not see that it would affect his valuation; he did not know the 1940 net income of $175,334.81 was used to cover losses of prior years; that if net income available from 1938 to 1943, inclusive, for interest on investment was as reflected by Exhibit O, Table I, his opinion of value would be less, but just how much he could not say as he relied on no one factor alone;

(e) He deemed the Company successful, though for sixteen years after 1924 the Company paid more in dividends than the amount of earnings available;

(f) As to the Company in 1936 renewing its major leases, he relied upon the statement of attorneys, but if that be not so,

his value would decrease at the rate of $1,000 per acre; and said he was not familiar with the details of the leases;

(g) The Company's net income figures since 1937 included "Compliance Payments," a Government subsidy under the Sugar Act, 7 U.S.C.A. § 1100 et seq., and in 1943 the Company paid a dividend of $150,-000 out of $186,969 available for that purpose, of which $177,416 had been received as a Government subsidy;

(h) The remaining cane lands, the mill, the irrigation system, and all permanent improvements were as good the day after the takings as before, but he said that they then were of lower value due to an overcapacity; for what was left, he said a buyer would pay less because the mill then became oversized and represented too much capital invested in relation to dollars which it could earn with the land available—in other words, that the land left called for a smaller mill with but a 15,000-ton capacity in order to make a profit on the invested capital;

(i) He agreed with the President of the Company that by the Government's takings the Company had lost over 50% of its invested capital, but agreed that Exhibit O, Table IX, did not so show;

(j) In 1940 and thereafter it cost the Company more to grow and produce raw sugar than to buy it;

(k) He personally knew nothing of the price of cane land and had made no investigation;

(l) He considered that the demand indicated that the public highly regarded the Company's stock, but granted that it dropped from $30 in 1936 to $8 in 1937, 1938, 1939; from 1939 to 1940 down to $4.62; and rose in 1943 to $9.87 and to $10.25 in 1944;

(m) He assumed good management of the plantation, but granted it was a speculative factor affecting profits;

(n) Loss of land permanently impaired ability of the remaining property to produce earnings commensurate with residual value;

(o) He agreed with the Company's President's statement to Congress that the Com-

pany with lands remaining could only be operated "inefficiently, expensively, and, therefore, uneconomically";

(p) He gave no dollar value to any of the factors he considered; and

(q) Defined a business loss to be a shrinkage of value not due to the property itself, but an intangible as distinguished from a tangible loss.

B. *C. Campbell Crozier,* an experienced local appraiser, currently Territorial Deputy Tax Commissioner in charge of assessments, after stating his general familiarity with the Plantation Company's property, said that in his judgment upon a *before* and *after* taking basis, the Honolulu Plantation Company's physical properties, excluding movables and growing crops, had a 20% diminishing value, or were about $1,-000,000 less valuable after these takings.

In support of his opinion, Mr. Crozier stated that:

1. By the takings 1,087 acres of cane land had been lost, or 23% of the Company's cane acreage; and

2. He used the "$1.000-an-acre rule," for it represented the amount of capital required to turn leased virgin land into irrigated cane land. So the *before* value was approximately $4,000,000 and the *after* value approximately $3,000,000, as around 1,000 acres were taken away.

Upon cross-examination Mr. Crozier allowed substantially the same things as did Mr. Schmutz, that is, he conceded that he took into consideration generally in forming his judgment nearly all aspects of the Company on an over-all basis but to no particular item did he give any special weight or dollar-and-cents value. For example, he said that:

1. To the Company's earning record he generally gave some weight, but was not acquainted with the Company's losses;

2. He had a general familiarity with the Company's leases and assumed they were renewed in 1936, and considered the new capital invested in the leased land during the three years following;

3. He based his opinion essentially upon the loss of capital;

4. He considered the Company economically run though it bought raw sugar to refine for less than it could produce it itself.

On the nonexpert side there is the testimony of:

A. *Philip E. Spalding,* President of C. Brewer & Company, Ltd., agent for the Honolulu Plantation Company, who is also Vice-President and an attorney in fact of and for the Honolulu Plantation Company; and of

B. *S. L. Austin,* former manager of the Honolulu Plantation Company, now a Vice President of C. Brewer & Company, Ltd., and an attorney in fact for the Honolulu Plantation Company.

A. Mr. Spalding testified that:

(1) Before the takings the mill had a potential of 22,000 tons of sugar per year, and of but 15,000-16,000 tons per year after these takings, and consequently the mill's operation became very expensive and it could not be operated as efficiently, lacking a year-round supply of cane, hence the mill's value was reduced;

(2) The takings had a like effect upon the Company's irrigation system and other improvements—indeed, all in all the takings made the Company an unprofitable economic enterprise;

(3) There was no market upon which at the time of these takings a plantation could be sold, but in 1943 he had tried to interest the Oahu Sugar Company in buying the Company, but not until late 1946 did he succeed in selling what was left to that company and then as of January 1, 1947;

(4) The takings started piecemeal under rights of entry, but later the Navy moved in without rights of entry and things got so bad that he described the Company's grave position to Vice Admiral Ghormley, asking that the Navy buy the Company outright else it would have to appeal to Congress for relief, as it had no legal remedy available. (See Exhibit I.)

(5) The Company began to lose value on a descending scale as takings occurred until at some point it was pushed over the edge and became an uneconomic concern—an economic failure—and could no longer

exist as a profitable company, hence its remaining property had much less value;

(6) During the war, by special arrangements, the Company was able to keep going as it could buy raw sugar to refine from 28 local plantations. Ordinarily, these 28 plantations sent their raw sugar to their own refinery located at Crockett, California, where their cooperative known as the California and Hawaiian Corporation operated a refinery. For this period to supply the Army and Navy in the Pacific with white sugar, all plantations sold their raw sugar to the Company, as it had the nearest and only sizeable refinery in Hawaii. In time of peace the Company could buy raw sugar locally from only one plantation, and that in a quantity insufficient to utilize the mill's capacity.

B. Mr. Austin's testimony as to value was similar to Mr. Spalding's though in greater detail as to the sugar process and specific items and figures. But on the point under consideration he stated specifically that *before* the takings the Honolulu Plantation Company was worth $4,300,000 and only $3,300,000 *after,* a loss of $1,000,000. Mr. Austin, too, used the $1,000-an-acre rule of thumb used locally by plantation men.

There can be no doubt that by these thirteen piecemeal takings of 1,087 acres of cane land upon which the Honolulu Plantation Company had leases, the Company has suffered a fatal blow. To be sure, as the takings continued the Company could well foresee that postwar it economically faced "impending death." (See Exhibit I.)

 But this, it must be remembered, is an action at law confined under Fifth Amendment to rigid rules requiring the Government to pay just compensation only for what it takes. Equitable principles, no matter how well founded, are rendered inoperative in a condemnation proceeding. The slight intimation in United States v. General Motors Corporation, 1945, 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311, 156 A.L.R. 390, that there may be a small area wherein, upon unusual facts, equitable principles become operative, has by succeeding cases been narrowly confined. See United States v. Petty Motor Co., 1946, 327 U.S. 372, 66 S.Ct. 596, 90 L.Ed. 729.

The parties do not dispute the law. They take issue only as to what the evidence establishes.

 It is conceded that where but a part of an owner's property is taken he may recover in a condemnation proceeding not only the fair market value of the land taken, but also for any decrease in the value of the untaken part of the land unit. See United States v. Miller, 1943, 317 U.S. 369, 376, 63 S.Ct. 276, 87 L.Ed. 336, 147 A.L.R. 55, and cases there cited.

 And it is agreed that in a condemnation case a landowner cannot be compensated for business losses. Upon a balancing of conflicting public and private interests, the courts have consistently held over the years that indirect losses and consequential damage must be borne by the private property owner, and not by the United States. In Mitchell v. United States, 1925, 267 U.S. 341, at page 345, 45 S.Ct. 293, at page 294, 69 L.Ed. 644, the Supreme Court said on this point:

"* * * The settled rules of law however, precluded his considering in that determination consequential damages for losses to their business, or for its destruction. Joslin Manufacturing Co. v. [City of] Providence, 262 U.S. 668, 675, 43 S.Ct. 684, 67 L.Ed. 1167. Compare Sharp v. United States, 191 U.S. 341, 24 S.Ct. 114, 48 L.Ed. 211; Campbell v. United States, 226 U.S. 368, 45 S.Ct. 115, 69 L.Ed. 328. No recovery therefor can be had now as for a taking of the business."

And in United States v. Petty Motor Co., 1946, 327 U.S. 372, 377, 66 S.Ct. 596, 599, 90 L.Ed. 729, the Supreme Court stated:

"The Constitution and the statutes do not define the meaning of just compensation. But it has come to be recognized that just compensation is the value of the interest taken. This is not the value to the owner for his particular purposes or to the condemnor for some special use but a so-called 'market value.' It is recognized that an owner often receives less than the value of the property to him but experience has shown that the rule is reasonably satisfac-

tory. Since 'market value' does not fluctuate with the needs of condemnor or condemnee but with general demand for the property, evidence of loss of profits, damage to good will, the expense of relocation and other such consequential losses are refused in federal condemnation proceedings."

While in the Baetjer case, 1 Cir., 1944, 143 F.2d 391, 395, the same rule is recognized in this language:

"The 'just compensation' guaranteed by the Fifth Amendment 'is for the property, and not to the owner' (Monongahela Navigation Co. v. United States, 148 U.S. 312, 326, 13 S.Ct. 622, 626, 37 L.Ed. 463), that is to say, 'the sovereign must pay only for what it takes, not for opportunities which the owner may lose' (United States v. Powelson, 319 U.S. 266, 282, 63 S.Ct. 1047, 1056, 87 L.Ed. 1390), so that, as a result, 'There are numerous business losses which result from condemnation of properties but which are not compensable under the Fifth Amendment.' Id., 319 U.S. at page 281, 63 S.Ct. at page 1055, 87 L.Ed. 1390; Mitchell v. United States, 267 U.S. 341, 345, 45 S.Ct. 293, 69 L.Ed. 644, and cases cited."

Defendant, however, relies upon other language in the Circuit Court's opinion in the Baetjer case. The Baetjer case came to the appellate court from the federal district court for Puerto Rico, and the facts of the case are very similar to the facts here in that a sugar plantation using various scattered fee-owned parcels as an agricultural unit was involved, the Government had taken some of its land and it endeavored to recover severance damage for the decreased value of the remaining physical properties, especially its mills. The district court excluded certain evidence and ruled against Baetjer and the other trustees of Eastern Sugar Associates. In so doing the Circuit Court said (1 Cir., 143 F.2d 391, 396):

" * * * If it [the excluded evidence] means that after the taking the appellants' mills had an uneconomic over-capacity so that they could not be operated by the appellants as efficiently and therefore as profitably as before the taking, then the stricken evidence shows only a loss to business

which resulted as an unintended incident of the taking and so a loss not compensable under the doctrine of Mitchell v. United States, supra. On the other hand, if it means, and there is other evidence tending to show that this is what the witness who used the phrase meant by it, that the over-capacity of the mills with respect to cane lands available to supply them has depreciated their value on the market * * *, then the evidence would tend to show a compensable loss. In short the stricken evidence would indicate a compensable loss only if it means that after the taking the appellants' mills had an uneconomic over-capacity so that they could not be operated by anyone as efficiently and therefore as profitably as before the taking, this being a matter which a hypothetical willing buyer would consider in determining what he would pay for the property."

Under these instructions upon remand, the lower court received the hitherto excluded evidence and upon the issue also evidence tendered by the Government, and thereafter held that though there had been a legal severance of the scattered lands which had been operated as a unit, the owner had failed to prove that the damage suffered by the severance was compensable. The loss suffered, it declared, was a noncompensable business loss. United States v. 7936.6 Acres, D.C. Puerto Rico, 1947, 69 F.Supp. 328.

Here, to say the least, the situation is confusing. First, the evidence reveals that this claim formed a part of a larger claim made to the 79th Congress, and the Company represented to Congress in unmistakable language that it was asking for relief at its hands because it had suffered a capital or business loss for which it had no remedy at law.

Secondly, though a prudent buyer, to be sure, would take general note of all the factors mentioned by the experts, nevertheless stripped of all the generalities, the experts essentially base their judgment upon the same point as the former plantation manager, that is, all said that the Company suffered a capital loss at the rate of $1,000 per cane acre as it takes that number of dollars to turn virgin land into land capable of

growing sugar cane successfully. Thus far, as before Congress, the Company is talking the language of a capital loss. But here it takes a step beyond, and

Thirdly, envelops itself in the language of the Baetjer case. At this point the witnesses, carrying forward the picture of what has happened, theoretically place what is left upon the block in the market place and then, viewing it from the eyes of a buyer, say with the First Circuit Court that it is not worth the amount of invested capital which it represents but something substantially less, and therefore what has happened to the Company has depreciated the value of its remaining property.

It would seem that as if by magic a non-compensable capital loss has now become a loss of real property value.

Very definitely the witnesses here meant what the First Circuit Court considered in that case a witness might have meant by "in value of excess equipment." Here all the evidence and the only evidence, as given by two expert appraisers and two men experienced in plantation affairs, is that the over-capacity of the mill due to the limited acreage available to supply it not only made the Company economically unprofitable but those same facts depreciated the market value of the remaining property, for a buyer being able to do no better than the Company could in this situation would pay less, at the rate of $1,000 an acre for each cane acre taken, for what was left of the plantation's physical property and its permanent improvements.

Although not a little disturbed by the facility by which an admitted capital or business loss is transformed into a loss of real property value, theory must yield to the reality of the market place where values are established.

█ The ascertainment of the fair market value, or here in the absence of a market for sugar plantations, of "fair value" in a condemnation proceeding is a very practical matter. While it is true that after these takings what was left was in just as good a condition, generally, as it had been the day before, it does not necessarily follow that it therefore is just as valuable. It is plain common sense that a buyer would

pay for property what it is worth to him— buy at a figure at which he could reasonably foresee making a profit upon his investment. Considered in this practical light, I am satisfied by the evidence that the Company has proven its claim that its remaining property decreased in value at the rate of $1,000 an acre for each cane acre taken.

Because in its representations to Congress the Company made a mistake of law in interpreting its facts, I do not believe that its right to recover upon the strength of the Baetjer case should be barred. It still remains true that by the takings it suffered a capital loss, but as that, in turn, directly affected the value of the remaining property, severance damage occurred and may be recovered here.

IV–A. *Should the measure of damage be applied to 1,087.59 acres?*

So far it has been assumed that the Company had long-term leases upon the land which it operated as an agricultural unit and that those leases allowed it to claim severance damage. The Government questions both of these representations made by the Company.

The breakdown of the 1,087.59 lost acres as to sources is to be found in Exhibit 6 and the leases themselves in the Exhibit 9 series—leases which interestingly reflect that the land situation in Hawaii gives leasehold plantation companies as much trouble as do their agricultural and marketing problems.

Exhibit 9–A is a lease from L. L. McCandless. This 30-year lease expired without right of renewal on December 31, 1939. A tenancy at will existed thereafter, for on August 18, 1941, Mr. McCandless having died, the representatives of his estate approved a continuation of the tenancy at will for an indefinite period, but for no longer than the duration of the probate administration of the estate because thereafter Mr. McCandless's property was to be handled by a trust created under his will. There is no evidence that the probate had been concluded and that a new lease had been obtained from the McCandless trust. Presumably, then, the Company remained in possession as a tenant at will.

Exhibit 9-B is a lease from McCandless, expiring without right of renewal on August 31, 1944, and containing certain restrictions. This lease expired about two months after the agreed date of taking (June 21, 1944). Like Exhibit 9-A, this lease has no condemnation clause.

Exhibit 9-C is also a McCandless lease, expiring without right of renewal on December 31, 1944. It contains a clause that at the end of the term "or other sooner determination" the lessee should surrender the premises and all improvements thereon. The lease contains no specific condemnation clause.

Exhibit 9-D is an extended lease from Francis H. I. Brown, expiring without right of renewal on September 30, 1946, but subject to cancelation upon 90 days' notice in writing and in that event the lessee could have time to harvest crops. The lease contains no specific condemnation clause or clause as to improvements.

Exhibit 9-E is an extended lease from Noa W. Aluli, expiring without right of renewal on December 31, 1948. The lease contains no specific condemnation or improvement clause.

Exhibit 9-F is a sublease from Oahu Sugar Company of Bishop Estate land, running for 24½ years from January 1, 1941. It is not assignable without the sublessor's consent, and it has a general termination clause and a specific condemnation clause providing that in that event the leasehold estate shall terminate and the lessee shall not have a right to claim compensation against anyone, but that all compensation shall go to the sublessor exclusively.

Exhibit 9-G is a 25½ year lease from the Bishop Estate from July 1, 1940, containing a specific condemnation clause reserving in the lessee the right in its own behalf to claim severance damage.

Exhibit 9-H is a lease from the Austin Estate for 25 years from January 1, 1941, which contains a condemnation clause similar to the one in Exhibit 9-G.

Exhibit 9-I is a 25½ year lease from July 1, 1940, from the Oahu Railway and Land Company, assigned by it to its subsidiary, The Hawaiian Land & Improvement Company, Limited, with a like condemnation clause.

Exhibit 9-J is a lease from the Queen Emma Estate for 29 years from January 1, 1937, which also has a like condemnation clause.

Exhibit 9-K is an alleged lease from the Damon Estate. The Company claims that by two letters attached to the Exhibit, the lease which expired in 1943 was extended for 10 years, or until December 31, 1953. These letters and also other letters (Exhibits A, E, F, G and H) reveal that all of the terms and conditions of the proposed lease had been settled, but that the parties expressly contemplated the execution of· a written lease, which was never done. Nor did the Company ever seek specific performance of the contract, though it did submit to the Estate a proposed form of lease. The Estate indicated on August 15, 1941, that it rejected the Company's form, and meanwhile condemnation actions affected the agreement and also the Estate indicated in the letter that it wanted to make certain changes in the basic agreement. On August 21, 1941, the Company rejected the proposed changes and said that the condemnation of certain areas of land covered by the October 21, 1940, agreement created no problems, for as a matter of law the agreement was subject to such a contingency, and wrote that it held the Estate to its agreement. See Exhibit 18. During 1943, the manager of the land department of C. Brewer & Company, Ltd., in behalf of Honolulu Plantation Company, by letters (Exhibits G and H) acknowledged that the Company's Damon Estate lease was to expire on December 31, 1943. After that date the Company seems to have remained in possession as a tenant at will under the old lease, which oddly contained no condemnation clause—nor more strangely did the draft of the proposed new lease (Exhibit B). It is of interest to note that between 1941 and 1943 more takings by the Government of Damon lands involved in the proposed lease were occurring, so that it was becoming possible to include less than a hundred acres in the new lease.

whereas the old one had originally covered nearly a thousand acres. Perhaps for this reason the Company never brought suit for specific performance of its contract to lease the lands covered by the agreement, but not condemned.

The leases in the Exhibit 9 series, which are the leases upon which the Company relies, do not wholly support its position. To repeat, for purposes of orientation, the Company bases its claim upon the representations that:

(a) In 1936 it renewed its four major leases to 1965, except as to one, its Damon lease, which was said to have been extended to 1953; invested over one million dollars of new capital; and thus in effect became a new enterprise;

(b) Before these 13 takings it had 4,397.-34 acres of cane land under cultivation and afterwards only 3,309.75 acres, a difference of 1,087.59 acres, which decreased the value of what remained at the rate of $1,000 per acre.

 The leases upon which the Company relied do not bear out these figures. The prospect, based on prior dealings over the years with the same lessors, of being able to obtain renewals of expired leases even at greater cost, while a good prospect, did not, nevertheless, create in the Company a new estate in the lands or give it a legal right to cause such to come to pass. Emery v. Boston Terminal Co., 1901, 178 Mass. 172, at page 185, 59 N.E. 763, 86 Am. St.Rep. 473.

Upon leaseholds affected by the takings, 440.175 acres of cane land·out of the 1,087.-59 acres lost can be relied on to measure the severance damage, for they were a part of a larger acreage in which the Company did have substantial leasehold estates. That is, it had at the consolidated date of taking (June 21, 1944) long-term leasehold estates under terms permitting it to claim severance damage in lands leased from:

1. The Queen Emma Estate, from which taken in these proceedings were (Exhibit 9–J) . . . . . . . . 21.79 acres
2. The Bishop Estate, from which taken here were (Exhibit 9–G) . . . . . . . 311.833 acres
3. The Oahu Railway and Land Company, from which taken here were (Exhibit 9–I) . . . . . . . . 103.64 acres
4. Plus land owned in fee by the Company, from which taken here were 2.912 acres

Total . . . . . . . . . . 440.175 acres

Dismissed from consideration in applying the rule of damage are the following:

a. The Aluli lease (Exhibit 9–E) simply because it does not enter into the calculations totaling 1,087.59 acres lost and upon which the Company bases its claim.

b. The Oahu Sugar Company lease (Exhibit 9–F), of which 48.61 acres, though forming a part of the 1,087.59 acres, cannot be included because by its condemnation clause the Company is not entitled to severance damage.

c. The three McCandless leases (Exhibits 9–A, 9–B, 9–C), of which 3.795 acres form a part of the 1,087.59-acre claim, because the Company had no substantial estate in these lands as the leases had expired without right of renewal and the Company was in possession merely as a tenant at will.

This leaves the question as to whether or not the so-called Damon lease (Exhibit 9–K) can be included in computing the severance damage at the rate of 595.01 acres.

The known facts are that:

1. The old Damon lease expired December 31, 1943. It had no condemnation clause.

2. Anticipating the expiration of the then existing lease, on October 18, 1940, the trustees of the Damon Estate offered in writing (Exhibit 9–K) to enter into a new lease with the Company upon terms specified for a period of ten years from January 1, 1944. The offer disclosed that due to anticipated condemnation proceedings not all of the lands involved might be available for lease.

3. By letter dated October 21, 1940, the Company accepted the Estate's offer. (Exhibit 9–K)

4. By the terms of this contract both parties had expressly in mind the execution of a formal lease. This was never

done, nor did the Company ever bring suit for specific performance.

5. The Company submitted a proposed formal lease (Exhibit B), which like the old lease had no condemnation clause.

6. The Estate began to hedge in view of condemnation actions anticipated in October 1940, which had by August 21, 1941, become realities, and indicated that the Company's proposed lease ·was not satisfactory for various reasons. (Exhibit E)

7. The Company on the same date notified the Estate that it held it to its contract and that by law, of course, condemned acres would be excluded from the lease. (Exhibit 18)

8. During 1943 the Company acknowledged that its old lease expired December 31, 1943. (Exhibits G and H)

9. Subsequent to the agreement of October 1940, the Company notified the Estate that in reliance thereon it had done certain things to and on the land. (Exhibit C) The Company, in reliance upon the so-called new lease, had planted new crops, prepared new cane fields, and put more money into the irrigation system. It is said in reliance upon the October 1940 agreement the Company invested $75,000 in the Damon lands, and when the old lease expired it paid the Estate the rent called for by the 1940 agreement and the Estate accepted it.

Just how many Damon acres the Company had upon the date of taking (June 1944) is not made clear. All that appears is that Exhibit O, Tables XIII and XIV, shows that in 1939 the Company had 977.5 acres of Damon Estate cane land; that by the end of 1943 condemnation actions had reduced the acreage to 208.46 acres and by the end of 1944 to 64.75 acres.

This is interesting, especially as it probably explains why the Company never sought specific performance of its 1940 contract, but it is of no importance. This is so because by the consolidation order—oddly consented to by the Government—all of these thirteen takings must be deemed to have occurred on June 21, 1944. Therefore, on that day upon this artificial basis the Company must have had more acreage than it lost.

In the light of the consolidation order the real question is, therefore: Did the Company have on June 21, 1944, such an interest in the remaining land held by it under the Damon title as to entitle it to severance damage?

Relying upon Wong Kwai v. Dominis, 1901, 13 Haw. 471 at 477 (1901), the Company contends that it had by reason of the October 1940 agreement not merely a contract for a lease but actually a new lease for 10 years upon the Damon lands. With this contention the Government, of course, disagrees.

The facts, in my opinion, dictate 'a negative answer to the question above stated.

Whether here there is a lease or an executory contract for a lease depends essentially upon the intention of the parties, as gathered from the terms of their October 1940 agreement. If it is a lease, the Company acquired an estate in the lands for 10 years from January 1, 1944. If it is not, it acquired simply an executory right to compel the Damon Trustees to convey to it such an estate, for breach of which contract the Company could recover damages or sue for specific perfomance. Dan Cohen Realty Co. v. National 'Savings & Trust Co., D.C.E.D.Ky.1941, 36 F.Supp. 536, affirmed 6 Cir., 1942, 125 F.2d 288; Thompson on Real Property (1940), Vol. III, Sec. 1214 et seq.; Tiffany, Landlord and Tenant, Vol. I, p. 371; 32 Am.Jur., Landlord and Tenant, Sec. 28 et seq.

The law of Hawaii on this subject is in accord. See Larrisch v. Schaefer, 1875, 6 Haw. 140, and the case of Wong Kwai v. Dominis, supra, upon which the Company relies and which the court said was "a case of unusual difficulty," actually stands for no different proposition of law. The language from that case upon which the Company no doubt relies: " * * * The fact that a formal· lease was contemplated did not prevent the letter and the acceptance of its terms from constituting a final binding contract, the preparing and signing of the lease being merely in execution of the contract, * * * " gives the

Company but passing comfort, as all of the authorities agree that in a factual situation of the type with which we are here concerned the answer to the question of whether or not the facts spell out a lease or simply an agreement for a lease is dependent upon the intent of the parties. The fact that the parties contemplate executing in the future a formal lease does not, of course, prevent the agreement itself being a lease if such was the intention of the parties, as clearly manifest by the facts. On the other hand, dependent upon the facts, of course, such a provision for the execution of the lease in the future may be some evidence that the parties did not by the agreement then and there intend a present demise of the premises.

A close examination of the facts shows that while it is true that all of the terms were generally specified in abbreviated style or were readily ascertainable with reference to other facts, nevertheless the agrement speaks not in terms of a present demise of an estate to begin at a future date, but, on the contrary, reveals an agreement to later execute a lease. As before noted, the fact that the parties expressly, as here, contemplate the execution of a formal lease does not in and of itself prevent an agreement from being a lease if such is the parties' intent and if they regard the formal lease as simply a reassurance. But unless that is apparent—and it is not here—the provisions for the execution of a lease with covenants upon the basis of the agreed upon terms is strong evidence that the agreement was not intended by the parties to be the lease. Here the offer concluded: "If these terms are agreeable a formal lease can then be drawn up," and the acceptance concluded: "We will prepare a tentative form of lease for submission to you."

More importantly, the agreement does not speak in terms of a present demise. The Estate indicated that it was "willing to lease," referred to 'the "land to be leased" and to certain areas "to be surrendered" by the Company, said what the rent was "to be" "if" the Sugar Act continued. And the acceptance of the offer spoke of the lands "to be leased." All in all, by the language used by the parties the emphasis is not upon then and there creating an estate, but is upon what they bound themselves to do, respectively, in the future when executing a lease. (See letters attached to Exhibit 9-K.)

This conclusion is attested to by the subsequent acts of the parties. For instance, by its August 15, 1941, letter (Exhibit E) the Estate said: "Due to our inability now to lease [certain condemned lands] * * * the Trustees * * * now propose to lease * * *" and there is other like language in Exhibit E. In rejecting the Estate's attempt to vary the terms of the agreement, the Company spoke (Exhibit 18) not of a lease, but of "a binding agreement." Indeed, the draft lease submitted by the Company (Exhibit B) is perhaps the best evidence that the Company itself did not regard the agreement as the lease, as the date is left blank and certain covenants from the old lease not mentioned in the 1940 contract are inserted.

Strong as is the Company's equity, the facts do not support its position that it had a new ten-year lease of Damon lands from January 1, 1944.

At best, having remained in possession after December 31, 1943, and thereafter having paid the yearly rent called for by the October 1940 contract, the Company had a year to year tenancy, with a right to sue for specific performance. An estate in that indefinite condition, involving the purchase of a law suit, would not be attractive to a buyer.

For these reasons, I do not believe that the Company had an estate in the Damon lands which supports its claim for severance damage with respect thereto at the rate of $1,000 per acre. Whether or not at a different rate it might have been entitled to severance damage for acreage remaining after these takings on which the Company had leases with but a very short time, comparatively, to go and without having a right of renewal and with respect to other lands which it held on a year to year basis as a tenant at will (Exhibits 9-A, 9-B, 9-C) is a subject upon which there is no proof and therefore no award as to such lands can be made.

Accordingly severance damage may be measured upon the basis of 440.175 acres only.

Judgment approved as to form in conformity herewith will be signed upon presentation.

### SUMMARY

#### I

| | | | |
|---|---|---|---|
| Civil No. 521 | Parcel 2A .............................. | | $100 |
| Civil No. 521 | Parcel 2B .............................. | | $75 |
| Civil No. 529 | Parcel F–1, as follows: | | |
| | The land alone .............. | $ 770 | |
| | The degree to which the pump house and four wells enhanced its value ........... | $23,000 | |
| | The frame house ........... | $ 768 | |
| | The sheds .................. | $ 100 | |
| | Total ....................... | | $24,638 |
| Civil No. 529 | Parcel F–2 ............................ | | $75 |
| Civil No. 535 | 2.732 acres ............................ | | $14,100 |

#### II

| | | |
|---|---|---|
| Civil No. 529 | For the part of the ditch on Oahu Railway and land Company land ................ | $6,185 |
| Civil No. 529 | For the part of the ditch on Bishop Estate land ................................ | $9,400 |

#### III

Civil No. 535 No award, for failure of proof, as to prepaid rent.

#### IV

Severance damage upon the basis of 440.175 acres ........ $440,175